# United States Court of Appeals
## For the First Circuit

No. 23-1853
No. 23-2051


SEAFREEZE SHORESIDE, INC.; LONG ISLAND COMMERCIAL FISHING
ASSOC., INC.; XIII NORTHEAST FISHERY SECTOR, INC.; HERITAGE
FISHERIES, INC.; NAT. W., INC.; OLD SQUAW FISHERIES, INC.,

Plaintiffs, Appellants,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; HONORABLE DEBRA
HAALAND, in her official capacity as Secretary of the Department
of the Interior; BUREAU OF OCEAN ENERGY MANAGEMENT; LIZ KLEIN,
in her official capacity as the Director of the Bureau of Ocean
Energy Management; LAURA DANIEL-DAVID, in her official capacity
as Principal Deputy Assistant Secretary, Land and Minerals
Management; UNITED STATES DEPARTMENT OF COMMERCE; HONORABLE GINA
M. RAIMONDO, in her official capacity as the Secretary of the
Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION, NATIONAL MARINE FISHERIES SERVICE; CATHERINE
MARZIN, in her official capacity as the Deputy Director of the
National Oceanic and Atmospheric Administration; UNITED STATES
DEPARTMENT OF DEFENSE; HONORABLE LLOYD J. AUSTIN, III, in his
official capacity as the Secretary of the Department of Defense;
UNITED STATES ARMY CORPS OF ENGINEERS; LT. GEN. SCOTT A.
SPELLMON, in his official capacity as the Commander and Chief of
Engineers of the U.S. Army Corps of Engineers; COLONEL JOHN A.
ATILANO, II, in his official capacity as the District Engineer
of the New England District of the U.S. Army Corps of Engineers;
VINEYARD WIND 1, LLC,

Defendants, Appellees,

RESPONSIBLE OFFSHORE DEVELOPMENT ALLIANCE, a D.C. nonprofit corporation,

Plaintiff, Appellant,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; DEBRA HAALAND, in her official capacity as the Secretary of the Interior; BUREAU OF OCEAN ENERGY MANAGEMENT; LIZ KLEIN, in her official capacity as the Director of the Bureau of Ocean Energy Management; NATIONAL MARINE FISHERIES SERVICE; RICHARD W. SPINRAD, in his official capacity as the Administrator of the National Oceanic and Atmospheric Administration; UNITED STATES DEPARTMENT OF THE ARMY; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; UNITED STATES ARMY CORPS OF ENGINEERS; JAMIE A. PINKHAM, in his official capacity as the Acting Assistant Secretary of the Army for Civil Works; VINEYARD WIND 1, LLC,

Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

---

Before

Gelpí, Montecalvo, and Aframe
Circuit Judges.

Theodore Hadzi-Antich, with whom Robert Henneke, Chance Weldon, Connor W. Mighell, and Texas Public Policy Foundation, were on brief for appellants, Seafreeze Shoreside, Inc., et al.

Roger J. Marzulla, with whom Nancie G. Marzulla, were on brief for appellant, Responsible Offshore Development Alliance.

Thekla Hansen-Young, with whom Todd Kim, United States Assistant Attorney General, United States Department of Justice; Luther L. Hajek, Perry Rosen, Mark Arthur Brown, Angela Ellis, Kevin W. McArdle, Environment and National Resources Division, United States Department of Justice; Stephen R. Vorkoper, Office of the City Solicitor, United States Department of Interior, Lea

- 2 -

Tyhach, Scott Farley, National Oceanic and Atmospheric Administration, Office of General Counsel, and Matthew J. Harris, United States Army Corps of Engineers, were on brief for appellees, United States Department of the Interior, et al.

Peter R. Steenland, with whom Jack W. Pirozzolo, David T. Buente, Jr., Peter C. Whitfield, James R. Wedeking, Kathleen Mueller, and Sidley Austin LLP were on brief for, appellee, Vineyard Wind 1, LLC.

_____

December 5, 2024

_____

**AFRAME**, <u>Circuit Judge</u>.  These appeals challenge the federal government's process for approving a plan to construct and operate a large-scale commercial offshore wind energy facility.[1] The facility, which began delivering power to the New England grid in early 2024, is located on the Outer Continental Shelf, some fourteen miles south of Martha's Vineyard and Nantucket.  The plaintiffs are entities involved in or associated with the commercial fishing industry.  The defendants are federal departments, agencies, and officials responsible for the plan approval process, as well as the business entity that successfully submitted the proposed plan and is constructing and operating the facility.  The plaintiffs sued to obtain declaratory and injunctive relief, asserting thirty-nine claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and several environmental statutes, described below.  The district court entered summary judgment for the defendants on all claims.  The plaintiffs appeal, arguing that the district court erred in multiple respects.  We affirm.

---

[1] The appeals were briefed and argued separately, but we address them together in this opinion.

A. **The Parties**

The plaintiffs in case no. 23-1853 are Seafreeze Shoreside, Inc., a Rhode Island seafood dealer; the Long Island Commercial Fishing Association, Inc., a trade group representing New York's commercial fishing industry ("LICFA"); XIII Northeast Fishery Sector, Inc., a private organization of commercial fishermen located in the Northeast; and three commercial fishing companies: Heritage Fisheries, Inc.; Nat. W., Inc.; and Old Squaw Fisheries, Inc. We refer to these entities collectively as the "Seafreeze plaintiffs" and to case no. 23-1853 as the "Seafreeze appeal."

The defendants in the Seafreeze appeal are the Department of the Interior; the Honorable Debra Haaland, in her official capacity as Secretary of the Interior; the Bureau of Ocean Energy Management ("BOEM"); Liz Klein, in her official capacity as the BOEM's Director; Laura Daniel-David, in her official capacity as the Interior Department's Principal Deputy Assistant Secretary of Land and Minerals Management; the Department of Commerce; the Honorable Gina M. Raimondo, in her official capacity as Secretary of Commerce; the National Oceanic and Atmospheric Association ("NOAA"); the National Marine Fisheries Service ("NMFS"); Catherine Marzin, in her official capacity as Deputy Director of the NOAA; the Department of Defense; the Honorable Lloyd J. Austin

III, in his official capacity as Secretary of Defense; the Army Corps of Engineers ("the Corps"); Lt. Gen. Scott A. Spellmon, in his official capacity as the Corps' Commander and Chief of Engineers; Col. John A. Atilano, II, in his official capacity as the Corps' District Engineer of the New England District; and Vineyard Wind 1, LLC, which submitted the approved plan and is constructing and operating the facility.  Vineyard Wind 1 was not initially sued but successfully intervened as a defendant.  We use "Vineyard Wind" to refer both to the project and its developer.

The plaintiff in case no. 23-2051 is Responsible Offshore Development Alliance ("Alliance"), a D.C. nonprofit whose membership includes fishing associations, seafood dealers, seafood processors, fishing vessels, and affiliated businesses.  We refer to case no. 23-2051 as the "Alliance appeal."

The defendants in the Alliance appeal are the Interior Department; Secretary Haaland in her official capacity; the BOEM; Director Klein in her official capacity;[2] the NMFS; Richard W. Spinrad, in his official capacity as the NOAA's Administrator; the Department of the Army; Christine Wormuth, in her official capacity as Secretary of the Army; the Corps; Jamie A. Pinkham, in his

---

[2]    The case caption lists Amanda Lefton as the BOEM's Director.  Director Klein replaced Director Lefton in 2023.

official capacity as Acting Assistant Secretary of the Army for Civil Works; and Vineyard Wind.

## B. Statutory Background

### 1. The Seafreeze Appeal

The Seafreeze appeal involves claims pursuant to, inter alia, the APA and the following environmental statutes:

### a. The Outer Continental Shelf Lands Act

The Outer Continental Shelf consists of all submerged lands beyond those reserved to the States and up to the edge of the United States' jurisdiction and control. 43 U.S.C. § 1331(a)(1). The Outer Continental Shelf Lands Act ("OCSLA") regulates the federal government's leasing of mineral and energy resources on these lands. See id. §§ 1331-1356c. The OCSLA establishes the Outer Continental Shelf as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." Id. § 1332(3).

To further these goals, the OCSLA authorizes the Department of the Interior, in consultation with other federal agencies and acting through the BOEM, to grant leases on the Outer Continental Shelf for the purpose of, inter alia, renewable wind energy production. Id. § 1337(p)(1)(C); 30 C.F.R. § 585.100. When granting such leases, the BOEM must "ensure that any activity under

[the OCSLA] is carried out in a manner that provides for" twelve criteria including, insofar as is relevant, safety; protection of the environment; conservation of natural resources of the Outer Continental Shelf; prevention of interference with reasonable uses of the Outer Continental Shelf (as determined by the Interior Secretary); and consideration of any other use of the sea or seabed, including use for fishing and navigation. 43 U.S.C. § 1337(p)(4); 30 C.F.R. § 585.102(a).

The BOEM's issuance of a lease does not itself authorize development of the site. See 30 C.F.R. § 585.200(a). To proceed to development, a lessee must formulate a site assessment plan, obtain the BOEM's approval of that plan, and then obtain the BOEM's approval of a construction and operations plan ("COP"). See generally id. §§ 585.600, 585.605-607, 585.610-614, 585.620-622, and 585.626-628. No construction may begin until the BOEM approves the COP. Id. § 585.620(c).

The OCSLA contains a citizen-suit provision. 43 U.S.C. § 1349(a)(1).

### b. The National Environmental Policy Act

The BOEM must comply with the National Environmental Policy Act ("NEPA") when approving a COP. 30 C.F.R. § 585.628. The NEPA is a procedural statute that requires federal agencies to take a "hard look" at the environmental impacts of and alternatives to a proposed action. Beyond Nuclear v. U.S. Nuclear Regul.

- 8 -

Comm'n, 704 F.3d 12, 19 (1st Cir. 2013). Generally, the vehicle for the required analysis is an environmental impact statement ("EIS"). See 42 U.S.C. § 4332(C). The EIS must analyze, inter alia, the "'reasonably foreseeable environmental effects' of the proposed action, the 'reasonable range of technically and economically feasible alternatives' to the proposed action, and reasonable measures to mitigate the environmental effects of the proposed action." Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt., 100 F.4th 1, 9 (1st Cir. 2024) (quoting 42 U.S.C. § 4332(C)). The NEPA "'does not mandate particular results, but simply prescribes the necessary process' for evaluating an agency action's environmental effects." Id. (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989)). This process is designed to prevent uninformed agency action and to provide information about environmental impact to the public and other government agencies so that they have an opportunity to respond. See Town of Winthrop v. FAA, 535 F.3d 1, 4 (1st Cir. 2008).

The NEPA does not contain a citizen-suit provision and is enforced through the judicial review provisions of the APA. See Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv., 674 F.3d 97, 102 (1st Cir. 2012).

- 9 -

## c. The Endangered Species Act

The BOEM also must comply with the Endangered Species Act ("ESA") when approving a COP. Section 7 of the ESA requires agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). To this end, a lead agency (here, the BOEM) must consult with the NMFS whenever an agency action "may affect" a listed marine species or critical habitat. 50 C.F.R. § 402.14(a); see also Nantucket Residents, 100 F.4th at 8. When such a consultation is required, the NMFS must issue a "biological opinion" stating whether the contemplated agency action is "likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4), (h). If so, the NMFS also must determine whether "reasonable and prudent alternatives" are available. Id. § 402.14(g)(5). The opinion must be based on the "best scientific and commercial data available." Id. § 402.14(g)(8); see also 16 U.S.C. § 1536(a)(2).

A lead agency must request reinitiation of consultation following the NMFS's issuance of a biological opinion if the agency has retained discretionary involvement in or control over the contemplated action, and certain other conditions, including new

information becoming available, are satisfied. See 50 C.F.R. § 402.16(a).

Generally, Section 9 of the ESA prohibits the "take" of an endangered species within the United States or the territorial seas of the United States. See Nantucket Residents, 100 F.4th at 8; 16 U.S.C. § 1538(a)(1)(B). A "take" includes the harassment of or harm to the species. Id. § 1532(19). A section 9 prohibition also can be applied to "threatened" (as opposed to endangered) species. See 16 U.S.C. § 1533(d).

One form of take is an "incidental take." During consultation, the NMFS may conclude that proposed agency action is not likely to jeopardize an endangered or threatened species but is reasonably certain to incidentally affect the species. In such a situation, the NMFS issues an "incidental take statement" along with its biological statement. See id. § 1536(b)(4); 50 C.F.R § 402.14(i). An incidental take statement details the extent of the anticipated take, reasonable and prudent measures to minimize and monitor it, and the terms and conditions under which such measures will be implemented. See 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). A take authorized in compliance with the incidental take statement is exempt from the ESA's take prohibition. See 16 U.S.C. § 1536(o).

The ESA contains a citizen-suit provision. 16 U.S.C. § 1540(g).

## 2. The Alliance Appeal

The Alliance appeal involves claims pursuant to, inter alia, the APA, the OCSLA, the NEPA, the ESA, and two additional environmental statutes.

### a. The Marine Mammal Protection Act

Congress enacted the Marine Mammal Protection Act ("MMPA") to prevent marine mammals from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part . . . ." 16 U.S.C. § 1361(2). While the MMPA generally prohibits the take (including the harassment) of marine mammals, id. §§ 1372(a), 1371(a) 1362(13); 50 C.F.R. § 216.3, it permits the NMFS to authorize, for a period not exceeding one year, the incidental "taking . . . of small numbers of marine mammals" if it concludes that "such taking . . . will have a negligible impact on such species," 16 U.S.C. § 1371(a)(5)(D)(i)(I).

Under the MMPA, there are two types of harassment: Level A and Level B. Relevant here is Level B harassment, which is "'any act of pursuit, torment, or annoyance' that has the 'potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavior patterns.'" Nantucket Residents, 100 F.4th at 9 (quoting 16 U.S.C. § 1362(18)(A)(ii), (18)(D)). The required contents of an incidental harassment authorization ("IHA"), and the process for obtaining such an authorization, are

- 12 -

described in 16 U.S.C. § 1371(a)(5)(D)(ii)(I), (II), (III), and 50 C.F.R. § 216.104, respectively.

The MMPA does not contain a citizen-suit provision and is enforced through the judicial review provisions of the APA. See Cetacean Cmty. v. Bush, 386 F.3d 1169, 1178 (9th Cir. 2004).

### b. The Clean Water Act and the Rivers and Harbors Act

Congress enacted the Clean Water Act ("CWA") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the "discharge of any pollutant" into "navigable waters," including the "territorial seas," unless done in compliance with the Act. Id. §§ 1311(a), 1344(a), 1362(7); 33 C.F.R. §§ 328.2, 328.3(a)(1), 328.4(a). The territorial seas generally include waters extending seaward three nautical miles from the coast but may also include other waters in contact with the open sea such as waters within three nautical miles from islands. See 33 U.S.C. § 1362(8); 33 C.F.R. §§ 328.4(a), 329.12(a).

Section 404 of the CWA authorizes the Secretary of the Army, acting through the Corps, to issue permits for discharges of dredged or fill material into waters of the United States. 33 U.S.C. §§ 1344, 1362(6)-(7). Permits must be issued in compliance with both the Corps' permitting regulations, 33 C.F.R. pt. 320, and regulations jointly developed by the U.S. Environmental

- 13 -

Protection Agency ("EPA") and the Corps, known as the "Section 404(b)(1) Guidelines," 40 C.F.R. pt. 230.

The Corps' regulations require that a permitting decision be based on "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest."  33 C.F.R. § 320.4(a)(1). Similarly, the Section 404(b)(1) Guidelines require the Corps to determine the potential impacts, including cumulative impacts, of proposed discharges.  40 C.F.R. § 230.11.  The Section 404(b)(1) Guidelines also state that the Corps should not issue a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  Id. § 230.10(a).  The purpose of the analysis required by the Section 404(b)(1) Guidelines is to ensure that proposed discharges will not have a significant adverse effect on human health or welfare, aquatic life, aquatic ecosystems, or recreational, aesthetic, or economic values.  See id. § 230.10(c)(1).

The Corps also may issue permits to authorize the installation of structures in navigable U.S. waters more than three nautical miles from the coast.  But it must do so pursuant to Section 10 of the Rivers and Harbors Act ("RHA"), see 33 U.S.C. § 403; 33 C.F.R. §§ 320.2(b) & 322.3(a)-(b), and not the CWA.

- 14 -

The CWA contains a citizen-suit provision. 33 U.S.C. § 1365(a). The RHA does not contain a citizen-suit provision and is enforced through the judicial review provisions of the APA. See Huron Mountain Club v. U.S. Army Corps of Eng'rs, 545 F. App'x 300, 390 & n.2 (6th Cir. 2013).

### C. **Factual and Procedural Background**

We recently decided two appeals involving challenges to the Vineyard Wind project brought by different plaintiffs. See Melone v. Coit, 110 F.4th 21 (1st Cir. 2024); Nantucket Residents, 100 F.4th at 1. We draw from our opinions in those cases to set forth the factual and procedural background of the Vineyard Wind project. We then provide additional relevant facts as necessary.

In 2009, the BOEM began evaluating the possibility of wind energy development on the Outer Continental Shelf off the coast of Massachusetts, pursuant to its authority under the OCSLA. Melone, 100 F.4th at 26. After several years of review, in 2014, the BOEM made "a small portion of the Massachusetts Wind Energy Area -- a section of the Outer Continental Shelf -- available for lease." Nantucket Residents, 100 F.4th at 10 (citing 79 Fed. Reg. 34771 (June 18, 2014)). In 2015, the BOEM leased a 166,886-acre (or 675-square-kilometer) portion of the area to Vineyard Wind. Melone, 100 F.4th at 26.

In December 2017, Vineyard Wind submitted to the BOEM a COP that proposed building an offshore wind project in an

approximately 76,000-acre zone of the lease area.  Id.  The COP contemplated the construction of turbines and additional wind energy infrastructure capable of generating approximately 800 megawatts of clean wind energy, enough to power approximately 400,000 homes.  Melone, 100 F.4th at 26; Nantucket Residents, 100 F.3d at 10.  In response to Vineyard Wind's submission, several federal agencies initiated an environmental review process.

In March 2018, the BOEM published a notice of intent to prepare an EIS responsive to the Vineyard Wind proposal.  83 Fed. Reg. 13777 (Mar. 30, 2018).  Following this notice, the BOEM held five public "scoping" meetings in the vicinity of the proposed project to identify issues and potential alternatives to the COP for consideration in the EIS.  In November 2018, Vineyard Wind applied for permits under CWA Section 404 and the RHA to construct an offshore cable transmission system that would connect the turbines to a landfall site at Covell's Beach in Hyannis, Massachusetts.  In December 2018, the BOEM issued a draft EIS, 83 Fed. Reg. 63184-02 (Dec. 7, 2018), which it supplemented in June 2020.

Meanwhile, on December 6, 2018, the BOEM requested consultation with the NMFS out of concern about the impact the COP might have on the endangered right whale.  Consultation commenced in May 2019.  On September 11, 2020, the NMFS issued a biological opinion concluding that the Vineyard Wind project would likely not

jeopardize the continued existence of the right whale. The opinion also contained reasonable and prudent mitigation measures deemed necessary to reduce the project's potential effects on the right whale. See generally Nantucket Residents, 100 F.4th at 10. On May 21, 2021, the NMFS issued to Vineyard Wind an IHA allowing the non-lethal, "incidental Level B harassment of no more than twenty" right whales. Melone, 100 F.4th at 26.

On May 7, 2021, the BOEM requested that the NMFS reinitiate consultation in response to two developments. First, the BOEM had concluded that the September 11, 2020, biological opinion did not fully assess the potential impacts on the right whale of fish monitoring surveys to be conducted by Vineyard Wind if its COP were approved. Second, more up-to-date information regarding the right whale population had become available since completion of the September 11, 2020, biological opinion. In requesting reinitiation of consultation, the BOEM documented its understanding that the September 11, 2020, biological opinion "will remain valid and effective until consultation is completed." The BOEM also represented that, if the COP were to be approved, "it would not allow the commencement of the aforementioned [fish

monitoring] surveys until [the reinitiated consultation] is concluded."[3]

The NMFS agreed to reinitiate consultation and, on October 18, 2021, issued an updated biological opinion. The updated opinion again concluded that the project would likely not jeopardize the right whale's continued existence. Both the 2020 and 2021 biological opinions also included incidental take statements which concluded that, after mitigation measures were implemented, the maximum anticipated take from project

---

[3] In a contemporaneously issued file memorandum, the BOEM explained that, while it had requested reinitiation of consultation on the fishery monitoring plan, approval of the project would "neither jeopardize the continued existence of ESA-listed species nor destroy or adversely modify designated critical habitat." Supp. App. at 1683, Seafreeze Appeal. The memorandum emphasized that reinitiation of consultation to consider fishery monitoring plans as part of the proposed action would "not provide any new information concerning potential effects on threatened and endangered species from construction, operation, and decommissioning of the project and, therefore, [would] not change the determinations of the [September 11, 2020, biological opinion] for the rest of the project already considered in the Opinion." Id. at 1684; see also id. at 1683 ("The authorization of Vineyard Wind I and the fishery monitoring plan are not interdependent. Although approval of the fishery monitoring plan . . . would not occur but for the project, the authorization of [the project] is not dependent upon approval of the fishery monitoring plan."). The memorandum also stated that, if the BOEM were to approve the COP, "commencement of any monitoring activities would be conditioned on the conclusion of this reinitiation and compliance with any NMFS survey mitigation measures that may be identified and included in the revised Incidental Take Statement and implementing Terms and Conditions in the revised Opinion." Id. at 1684.

construction was Level B harassment of twenty right whales caused by construction noise.

Between the issuance of the September 11, 2020, and October 18, 2021, biological opinions, several other relevant events took place. On December 1, 2020, Vineyard Wind notified the BOEM that it was withdrawing its proposed COP from review in order to conduct a technical and logistical analysis of the wind turbine generator it had decided to use in the final project design. See 86 Fed. Reg. 12494 (Mar. 3, 2021). This analysis sought to "review updated project parameters to confirm that [they] fell within the project design envelope" that the BOEM had used in conducting its earlier review. Id. The notice stated that Vineyard Wind intended to rescind its withdrawal of the COP upon completion of its analysis. Less than two months later, on January 22, 2021, Vineyard Wind notified the BOEM that it had completed its analysis and concluded that it did not need to modify the COP. Vineyard Wind also requested that the BOEM resume its review of the COP, and the BOEM did so, see 86 Fed. Reg. at 12494-95.

The BOEM issued a final EIS ("FEIS") on March 12, 2021. 86 Fed. Reg. 14153 (Mar. 12, 2021). The FEIS considered five action alternatives (one of which had two sub-alternatives) to the project proposed by Vineyard Wind in the COP. It also considered a no-action alternative. The FEIS identified the COP, with modifications drawn from several of the alternatives that the BOEM

had considered, as the preferred alternative. The FEIS also included a lengthy assessment of potential impacts from the project on the natural and human environment. It acknowledged that the project would likely have a negative economic impact on commercial fishing. But it suggested that potential revenue losses could be offset by compensatory funds that Vineyard Wind had agreed to set aside. It also proposed mitigation measures that would reduce negative impacts.

On May 10, 2021, the BOEM, the Corps, and the NMFS issued a joint record of decision ("ROD"). The ROD memorialized the BOEM's selection of the preferred alternative in the FEIS, the Corps' decision to issue the necessary CWA/RHA permits, and the NMFS's decision to issue the IHA. The ROD stated that the preferred alternative would allow eighty-four or fewer wind turbines to be installed in 100 of the 106 locations proposed in the COP. It also required that the turbines be placed in an east-west orientation with each turbine separated by one nautical mile.

The BOEM's approval of the COP was subject to several non-discretionary mitigation, monitoring, and reporting measures. The BOEM attached to the ROD a memorandum explaining why the preferred alternative satisfied the requirements of the OCSLA and other applicable regulatory authority. On July 15, 2021, the BOEM issued its final approval of the COP. The approval was subject to

more than 100 pages of terms and conditions, including compliance with any substantive amendments to the September 11, 2020, biological opinion that might arise from the ongoing reinitiated consultation. On January 20, 2022, after receiving the October 18, 2021, biological opinion from the NMFS, the BOEM confirmed its final approval of the COP subject to the terms and conditions, and prescribed reasonable and prudent measures, set forth in the updated opinion.

The Seafreeze plaintiffs and the Alliance filed the lawsuits underlying these appeals on December 15, 2021, and January 31, 2022, respectively. As explained, the Seafreeze plaintiffs sued under the APA, the ESA, the NEPA, and the OCSLA. The Alliance sued under the APA, the NEPA, the MMPA, the ESA, the OCSLA, and the CWA/RHA. In both cases, the parties cross-moved for summary judgment, and the district court, in a thoughtful order, granted the defendants' motions and denied the plaintiffs' motions.

The district court concluded, inter alia, that (1) the plaintiffs' ESA claims were non-justiciable under Article III of the Constitution, (2) the plaintiffs were outside of the zone of interests protected by the NEPA, (3) the Alliance was outside of the zone of interests protected by the MMPA, (4) the Alliance had failed to identify a genuine issue of material fact as to whether the Corps' issuance of the CWA Section 404 permit was arbitrary, capricious, an abuse of discretion, unsupported by substantial

evidence, or otherwise not in accordance with law, and (5) the plaintiffs had failed to identify a genuine issue of material fact as to whether the BOEM's approval of the project under the OCSLA was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. These appeals followed.

## II.

We review the district court's summary judgment rulings de novo. See, e.g., Melone, 100 F.4th at 29; Nantucket Residents, 100 F.4th at 12. These include the court's Article III standing and zones-of-interests rulings, the challenges to which raise legal questions. In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prods. Liab. Litig., 54 F.4th 28, 34 (1st Cir. 2022) (reviewing de novo the district court's ruling on Article III standing); T.S. ex rel. T.M.S. v. Heart of CarDon, LLC, 43 F.4th 737, 741 (7th Cir. 2022) (reviewing de novo the district court's zone-of-interests ruling).

We also review de novo the district court's summary judgment determinations that the defendants did not act in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that was "unsupported by substantial evidence." Melone, 100 F.4th at 29 (quoting 5 U.S.C. § 706(2)(A), (E)); see also Nantucket Residents, 100 F.4th at 12. An agency action or inaction is arbitrary or capricious if the

- 22 -

agency relied on factors Congress did not intend it to consider, failed to consider an important aspect of the problem, explained the decision in terms that run counter to the evidence, or reached a decision so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. See Melone, 100 F.4th at 29; see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Finally, we may affirm the district court's judgments on any independent ground supported by the record. E.g., Puerto Rico Fast Ferries LLC v. SeaTran Marine, LLC, 102 F.4th 538, 549 (1st Cir. 2024).

**III.**

**A. The APA/ESA Claims**

We first consider the challenges to the district court's grant of summary judgment to the defendants on the plaintiffs' APA/ESA claims. As previously noted, the court dismissed these claims as non-justiciable under Article III. Whether a claim satisfies the demands of Article III implicates our subject matter jurisdiction, e.g., United States v. Texas, 599 U.S. 670, 686 (2023), and so we must satisfy ourselves that we have subject-matter jurisdiction before addressing the merits of a claim, see Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93-102 (1998) (prohibiting the exercise of "hypothetical jurisdiction"). We therefore begin by reviewing whether the court

- 23 -

properly concluded that the plaintiffs' ESA claims were non-justiciable based on the summary judgment record.

The plaintiffs presented the district court with three developed theories of how the defendants violated the ESA. The first two, advanced by the Seafreeze plaintiffs, targeted aspects of the September 11, 2020, biological opinion, but not the superseding October 18, 2021, biological opinion. The third, advanced by the Alliance, argued that the sequence in which the defendants acted resulted in the issuance of the ROD and approval of the COP without there being in place a valid biological opinion.

The district court rejected all three arguments for a lack of standing and, alternatively, mootness. As to standing, the court first assessed the nature of the injuries that the plaintiffs were entitled to assert. See, e.g., FDA v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024) (observing that, to establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief"). The court concluded that, while each plaintiff had adduced sufficient evidence of economic injury due to the project's potential adverse effects on commercial fishing, no plaintiff had adduced admissible evidence of non-economic injury. In reaching this latter conclusion, the court rejected the

plaintiffs' arguments that they were appropriate parties to assert environmental and aesthetic interests that would be harmed by the project.

The district court then turned to whether the plaintiffs' evidence of economic injury, causation, and redressability was sufficient to establish that they had Article III standing to press their ESA claims. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (emphasizing that, at the summary judgment stage, a party claiming standing cannot rest on general allegations of injury resulting from the defendant's conduct but rather must adduce evidence to support the specific facts necessary to substantiate its standing theory); see also Bennett v. Spear, 520 U.S. 154, 167-68 (1997). The court concluded that the plaintiffs' evidence was insufficient to meet this burden as a matter of law.

With respect to the Seafreeze plaintiffs, who, again, only sought to challenge aspects of the superseded September 11, 2020, biological opinion, the district court determined that they had failed to adduce evidence that their economic injuries were likely caused by the project's alleged negative impact on any endangered species. With respect to the Alliance, the court determined that it had failed to adduce evidence that the procedural actions of which it complained regarding the two biological opinions either likely caused its alleged injury or likely caused any erroneous government decision. See Ctr. for

Biological Diversity v. EPA, 861 F.3d 174, 184 (D.C. Cir. 2017) (observing that a plaintiff alleging procedural injury must show both a connection between the error and a substantive agency outcome and a connection between that outcome and the plaintiff's particularized injury). In support of the latter ruling, the court observed that the October 18, 2021, biological opinion, which the Alliance did not challenge, served to break the chain of causation underlying the Alliance's standing theory.

Alternatively, the district court concluded that all of plaintiffs' claims were moot. As to the Seafreeze plaintiffs, their ESA claims were moot because they had targeted the September 11, 2020, biological opinion, and not the superseding October 18, 2021, biological opinion, which was the ultimate basis for the BOEM approving the COP. As to the Alliance, its ESA claim was moot because the alleged procedural error was rendered immaterial by the subsequent issuance of the superseding biological opinion, which the Alliance did not challenge, and which, again, was the ultimate basis for approving the COP.

On appeal, the Seafreeze plaintiffs present only one developed argument challenging the district court's standing and mootness rulings on their ESA claims.[4] They assert that the court

---

[4] The section of the Seafreeze plaintiffs' brief challenging the district court's ESA rulings contains three subparts. The first presents the developed argument we are about to address.

erred in refusing to recognize the LICFA's associational standing to assert, on behalf of LICFA member David Aripotch, certain non-economic environmental and aesthetic injuries arising from Vineyard Wind's impact on the project area. Aripotch, who is not a party, owns plaintiff Old Squaw and captains its boat. In the district court, he submitted a declaration detailing the aesthetic

---

The second, titled "The Commercial Fishermen's ESA Claims Were Not Mooted And The [September 11, 2020, Biological Opinion] Violated ESA In Multiple Ways," contains five brief arguments. Two reiterate the Seafreeze plaintiffs' merits challenges to the September 11, 2020, biological opinion and add nothing to the justiciability analysis. The other three involve variations on a single theme: that challenges to the September 11, 2020, biological opinion are not moot because that was the opinion in effect when the agency defendants issued the ROD and approved the COP. We shall have more to say about this argument in our discussion of the Alliance's challenge to the court's dismissal of its ESA claim. The third, titled "The District Court Erred In Holding That The Commercial Fishermen Waived Certain ESA Arguments," asserts that the district court erred in regarding as waived for lack of summary judgment briefing nine additional ESA claims the Seafreeze plaintiffs had asserted in their complaint. But the record citations the Seafreeze plaintiffs provide in support of this argument only point to a few passing mentions of these claims and attempts to incorporate by reference arguments made elsewhere, often by parties to other Vineyard Wind lawsuits. The record therefore confirms that the merits of these claims were not developed and argued in the summary judgment papers. See Rocafort v. IBM, Corp., 334 F.3d 115, 121-22 (1st Cir. 2003) (arguments raised in the complaint but not developed in summary judgment papers are waived); Exec. Leasing Corp. v. Banco Popular de P.R., 48 F.3d 66, 67-68 (1st Cir. 1995) (parties must include within the four corners of their briefs any arguments they wish the court to consider and cannot circumvent page limits through incorporation by reference of arguments made elsewhere). The district court appropriately declined to address the merits of these claims.

and spiritual pleasures he derives from fishing and photographing right whales and other marine life in the project area.

The district court rejected the argument for two reasons. First, it concluded that Aripotch's personal injuries and interests could not be imputed to Old Squaw, the corporation he owns. Second, the court refused to allow the LICFA to assert Aripotch's non-economic interests in the project area because the LICFA did not demonstrate that those interests are germane to its purpose of supporting fisheries management. See Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc., 528 U.S. 167, 181 (2000) (observing that an association may have standing to sue on behalf of its members when, inter alia, the member interest it is asserting is "germane to the organization's purpose").

The Seafreeze plaintiffs challenge the ruling that the LICFA failed to demonstrate that protection of Aripotch's aesthetic and spiritual interests in the project area is germane to its purpose. They call our attention to the LICFA's articles of incorporation. Those articles indicate that the preservation, maintenance, and welfare of the environment in the saltwater fisheries "in Suffolk County [New York] and its environs," now and for future generations, are among the purposes for which the LICFA was formed in October 2001. The Seafreeze plaintiffs sought to introduce the articles into the summary judgment record by means of a motion for judicial notice filed after the summary judgment

briefing deadline had passed. The court denied the motion as an untimely effort to supplement the summary judgment record.

The Seafreeze plaintiffs first say that this was reversible error because "no timeliness requirement exists for matters of judicial notice pertaining to standing, as jurisdictional rules like standing may be raised at any time." This argument is incorrect. Trial courts possess considerable case-management authority, which includes the authority to set deadlines for filing pretrial motions. Rosario-Díaz v. Gonzáles, 140 F.3d 312, 315 (1st Cir. 1998) (citing Fed. R. Civ. P. 16(b)(2)); see also Fed. R. Civ. P. 16(b)(3) (mandating that when federal trial courts issue scheduling orders, those orders limit the time for, inter alia, filing motions); L.R., D. Mass. 7.1(a)(1) (authorizing the establishment of briefing deadlines). If information calling into question the court's subject-matter jurisdiction becomes available after such a deadline has passed, the expiration of the deadline does not preclude an inquiry into the court's power to hear the underlying claim. See Fed. R. Civ. P. 12(h)(3) (stating that a court must dismiss an action if "at any time" it determines "that it lacks subject-matter jurisdiction" (emphasis supplied)). But this principle has no bearing on the court's authority to place reasonable time limits on the ability of a party asserting federal subject-matter jurisdiction to produce proof that Article III standing exists.

- 29 -

See <u>Town of Milton</u> v. <u>FAA</u>, 87 F.4th 91, 95 (1st Cir. 2023) (party asserting federal jurisdiction bears the burden of establishing Article III standing).

The Seafreeze plaintiffs also invoke Fed. R. Evid. 201(c)(2), which states that a court "must take judicial notice if a party requests it and the court is supplied with the necessary information," and Fed. R. Evid. 201(d), which states that a court "may take judicial notice at any stage of the proceeding." According to the Seafreeze plaintiffs, these Rules obliged the court to take judicial notice of the LICFA's articles of incorporation, even though the deadline for summary judgment briefing had passed. But even if the articles of incorporation are a proper subject of judicial notice because the LICFA had filed them with the New York Secretary of State, they would not provide grounds for the LICFA to represent Aripotch's personal interests in the project area.

The articles of incorporation establish only that a <u>stated</u> purpose for incorporating the LICFA in October 2001 was to protect the welfare of the environment in the saltwater fisheries in Suffolk County and its environs. They do not establish, as a matter of law, that this has been one of the LICFA's <u>actual</u> purposes in the years since its founding. It would deprive the defendants of their procedural right to contest the issue if we were to draw the broader inference from a document introduced into

the record after the summary judgment briefing had closed. Moreover, a commercial fishing association's interest in protecting the welfare of the area in which its members carry on their business does not, ipso facto, encompass an individual member's observational interests in the right whale or recreational interests in fishing and photography. And finally, the area to which the LICFA's environmental interests allegedly extend do not appear to include the project area, which is more than sixty-five miles away from Suffolk County.

We turn now to the Alliance's challenge to the district court's rejection of its ESA claim on justiciability grounds. The Alliance does not explicitly engage the particulars of the court's standing and mootness rulings. The section of the Alliance's opening brief addressing the rejection of its ESA claim contains two subparts. The first reiterates the merits of its ESA claim. That claim, as we understand it, is that issuance of an ROD based on a biological opinion that is subject to reinitiated consultation is a per se violation of the ESA, regardless of (1) what the agencies say about the ongoing validity and effectiveness of the earlier opinion, (2) the limited and discrete nature of the reinitiated consultation, and (3) steps the agencies take to ensure that the terms and conditions and reasonable and prudent measures contained within the updated opinion will be both enforceable and enforced. The second subpart argues that the Alliance has properly

alleged and demonstrated both economic and environmental injuries and a basis for representing the interests of its members.

The Alliance's lack of direct engagement with the substance of the court's justiciability rulings in its opening brief is itself grounds for rejecting its challenge to the entry of summary judgment on its ESA claim. E.g., Cioffi v. Gilbert Enters., Inc., 769 F.3d 90, 93-94 (1st Cir. 2014) (observing that an appealing party must explain "why a particular order is erroneous"); Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("[W]e do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief."). But, in any event, there is no basis for disturbing the court's justiciability rulings on their merits.

We assume solely for the sake of argument, but with skepticism, that the ESA prohibits the issuance of an ROD and approval of a COP while reinitiated consultation over a biological opinion is ongoing, regardless of circumstances. Compare Defenders of Wildlife v. BOEM, 684 F.3d 1242, 1252 (11th Cir. 2012) (rejecting argument that the "BOEM's choice to reinitiate consultation . . . automatically renders . . . former biological opinions invalid," particularly where the prior opinions were "reconfirmed" and "have not been withdrawn despite reinitiation of consultations"), with Env'tl Prot. Info. Ctr. v. Simpson Timber

Co., 255 F.3d 1073, 1076 (9th Cir. 2001) (stating in dicta and without elaboration that "[r]einitiation of consultation requires . . . the NMFS to issue a new Biological Opinion before the agency action may continue") (citation and internal quotation marks omitted)). Even so, this assumption does not undermine the court's justiciability rulings.

As explained above, the district court concluded, based on the summary judgment record, that the Alliance lacked standing to press its ESA claim because an event occurring after the alleged procedural error (the initial issuance of the ROD and approval of the COP without a valid biological opinion) broke the causal chain between that error and both the agencies' substantive action (approval of the COP) and the Alliance's alleged Article III injury (economic harm from the operation of the project). For the same reasons, the court concluded that the Alliance's ESA claim was moot because an event occurring after the alleged procedural error had rendered it immaterial.

The event on which both conclusions rest was the NMFS's issuance of the superseding October 18, 2021, biological opinion, whose merits the Alliance does not challenge. Once that superseding biological opinion issued, the district court reasoned, the Alliance could no longer claim that the alleged procedural error remained a legal cause of either the relevant substantive agency actions (the final COP approval) or the

- 33 -

Alliance's injury (economic harm caused by the COP approval). Seafreeze Shoreside, Inc., et al. v. U.S. Dep't of the Interior, et al., Nos. 1:22-cv-11091-IT, 1:22-cv-11172-IT, 2023 WL 6691015, at *28-29 (D. Mass. Oct. 12, 2023). Nor could the court provide a remedy that might affect the matter at issue because the Alliance alleged only an error that was no longer relevant to the agency action under review. See id. at *27 n.19 (citing Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (describing the essential characteristic of a moot case) and Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1114 (10th Cir. 2010) (holding moot an ESA claim that did not challenge a superseding biological opinion)).

In its reply brief, the Alliance addresses the district court's analysis by stating that the issuance of the superseding October 18, 2021, biological opinion, and the January 20, 2022, confirmation of the prior COP approval, "cannot cure" the BOEM's earlier procedural error of issuing the ROD and approving the COP while the 2020 biological opinion was under reinitiated consultation. "Because the iron-clad rule of ESA is to look before you leap," the Alliance says, "the later-issued [October 18, 2021, biological opinion] is irrelevant to the BOEM's procedural duty to comply with the ESA in rendering its decision [to issue the ROD] on May 10, 2021."

- 34 -

This argument misses the point. The significance of the NMFS's issuance of the unchallenged superseding October 18, 2021, biological opinion (and, we might add, the BOEM's January 20, 2022, confirmation of its prior approval of the COP given the conclusions in that unchallenged superseding opinion) does not lie in whether they "cured" any earlier-occurring procedural error. Rather, these later agency actions, taken as part of an ongoing and legally authorized consultation process, precluded any basis for finding that taint to the COP approval arising from its allegedly having been issued without a valid biological opinion was having any ongoing effect. And, if there was no basis in the summary judgment record for finding that the procedural violation complained of was having an ongoing effect, there was no basis in the record for either enjoining or unwinding the project, which is the specific relief the Alliance sought, or for concluding that the Alliance's injury was redressable in any way.

The district court thus did not err in awarding summary judgment to the defendants on the plaintiffs' APA/ESA claims.

## B. <u>The APA/NEPA and APA/MMPA Claims</u>

We next consider the challenges to the district court's grant of summary judgment to the defendants on the plaintiffs' APA/NEPA claims and the Alliance's APA/MMPA claim. We consider these challenges together because the court dismissed both sets of claims for being outside the zones of interests of the

- 35 -

environmental statutes that the plaintiffs invoked.  With respect to the APA/NEPA claims, the court held that the plaintiffs did not put forth competent evidence as to an environmental harm that would impact their commercial fishing.  With respect to the APA/MMPA claim, the court held that the Alliance had not established a cognizable interest in right whales or any other marine mammal.

An APA claimant must establish that the claim arguably falls within the zone of interests to be protected or regulated by the underlying statute.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129-30 (2014).  As the word "arguably" suggests, the zone-of-interests test "is not 'especially demanding.'"  Id. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)).  Congress enacted the APA "to make agency action presumptively reviewable," and we do not require "any indication of congressional purpose to benefit the would-be plaintiff."  Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, 567 U.S. at 225 (internal quotation marks omitted) (quoting Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 399 (1987)).  Thus, the zone-of-interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue."  Lexmark, 572 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of

Pottawatomi Indians, 567 U.S. at 225 (internal quotation marks omitted)).

The zone-of-interests test was once treated as a justiciability doctrine implicating the court's subject-matter jurisdiction. See id. at 128 n.4 (citations omitted). But in Lexmark, the Supreme Court clarified that the test is not jurisdictional but rather goes to whether the claimant has stated a viable claim. See id. (citations omitted). Therefore, we may affirm a zone-of-interests-based dismissal on other grounds supported by the record. See Puerto Rico Fast Ferries, 102 F.4th at 549. But cf. Steel Co., 523 U.S. at 93-102 (prohibiting affirmance of the dismissal of a claim based on lack of subject-matter jurisdiction by rejecting the claim on its merits).[5]

Here, we agree with the district court's zone-of-interests ruling as to the Alliance's APA/MMPA claim. The

---

[5] The plaintiffs' APA/NEPA challenges come to us in an odd procedural posture. The Seafreeze plaintiffs challenge both the district court's zone-of-interests ruling and the lawfulness under the NEPA of the BOEM's actions. The Alliance, however, challenges only the court's zone-of-interests ruling. It does not address the merits of its APA/NEPA challenge in either its opening brief or its reply brief, even though the government calls the lapse to its attention, and even though the success of its zone-of-interests argument would lead naturally to our consideration of the merits given the fully developed administrative record and opportunity the Alliance had to develop its APA/NEPA claims in the summary judgment briefing. Thus, to the extent that the Alliance intends to press any APA/NEPA claims that differ from those of the Seafreeze plaintiffs, they are waived.

Alliance argues that it may assert the aesthetic and recreational interests in marine mammals (including the right whale) of "Alliance member" David Aripotch. But this argument is based on a misstatement. Aripotch's company, Old Squaw, is a member of the Alliance, but Aripotch is not.[6] Moreover, and in any event, the protection of marine mammals such as the right whale is not germane to the Alliance's purpose, which is to represent the interests of commercial fisheries and related organizations. See Friends of the Earth, 528 U.S. at 181. The court properly awarded the defendants summary judgment on the Alliance's APA/MMPA claim.

But we disagree with the district court's zone-of-interests ruling as to the plaintiffs' APA/NEPA claims. While the court was correct to reject as incompetent much of the plaintiffs' evidence of environmental injury, the ROD itself acknowledges that the discharge of fill material associated with the project will have major adverse impacts on mollusks, fish, and crustaceans in the project area. Moreover, the plaintiffs have plausibly linked these adverse impacts to the expected adverse economic effects of the project on their commercial fishing

---

[6] In their responsive briefs, the defendants called our attention to the fact that Aripotch is neither a member of the Alliance nor a party to either of these consolidated appeals. The Alliance did not correct the misstatement in its opening brief or reply; rather, it simply changed its characterization of Aripotch from being an "Alliance member" to being a "representative" of an Alliance member.

interests.  This is enough to satisfy the zone-of-interests test. See Monsanto Co. v. Geerston Seed Farms, 561 U.S. 139, 155-56 (2010) (recognizing that plaintiffs whose alleged injuries from agency deregulation had both environmental and economic components fell within the APA and the NEPA's zone of interest).

Despite this, we affirm the dismissal of these claims. On appeal, the Seafreeze plaintiffs develop three arguments that the BOEM violated the NEPA's procedural requirements.  They explicitly premise all three arguments on an underlying assertion that the BOEM was improperly motivated to reach decisions so that Vineyard Wind could timely honor its prior contractual commitments surrounding the project.  The first argument is that this improper motivation led the BOEM to limit its consideration of reasonable alternatives to the project.  The second is that it led the BOEM to inappropriately revive the EIS process after Vineyard Wind's December 1, 2020, provisional withdrawal of its proposed COP from review to test the wind turbine generator it had decided to use. The third is that it led the BOEM to fail to appropriately consider the incremental impact of the project in combination with the likely impact of other future, reasonably foreseeable offshore wind development projects.

As an initial matter, the premise of the Seafreeze plaintiffs' arguments is misguided.  By regulation, the BOEM was under an obligation to "briefly summariz[e] [in the FEIS] the

- 39 -

purpose and need to which the agency is responding," 40 C.F.R. § 1502.13; to "[r]igorously explore and objectively evaluate all reasonable alternatives," id. § 1502.14(a); and, most importantly for present purposes, to consider "the needs and goals of the parties involved in the application or permit as well as the public interest," 43 C.F.R. § 46.420(a)(2).[7] Thus, where the agency is not itself the project's sponsor, it may give substantial weight to an applicant's preferences, at least insofar as it considers alternatives. See Beyond Nuclear, 704 F.3d at 19. This principle derives from the fact that, under the NEPA, agencies must consider only "reasonable" alternatives, meaning alternatives "bounded by some notion of [technical and economic] feasibility," id. (quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 551 (1978)), and only alternatives that would "'bring about the ends of the proposed action,'" id. (quoting Citizens

---

[7] The FEIS identified the BOEM's purpose and need as "whether to approve, approve with modifications, or disapprove the COP to construct, operate, and decommission an approximately 800 MW, commercial-scale wind energy facility within the area of [Vineyard Wind's] lease to meet New England's demand for renewable energy." Supp. App. at 972, Seafreeze Appeal. It also noted, inter alia, that the "BOEM's decision on Vineyard Wind's COP is needed to execute [the BOEM's] duty to approve, approve with modifications, or disapprove, the proposed Project in furtherance of the United States' policy to make [Outer Continental Shelf] energy resources available to expeditious and orderly development." Id. The plaintiffs do not challenge the lawfulness of this purpose and need statement.

Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. (1991)).

Apart from the erroneous premise, the Seafreeze plaintiffs' APA/NEPA arguments fail to establish that the BOEM engaged in arbitrary or capricious decisionmaking. The Seafreeze plaintiffs challenge the BOEM's failure to consider alternatives that would have required construction outside the lease area. But the BOEM supportably concluded that these were effectively new proposed actions that were not responsive to the agency's regulatory obligation to address the Vineyard Wind proposal, which was of course limited to the Vineyard Wind lease area. The BOEM also supportably explained that it would consider proposals on other lease areas through separate regulatory processes.

The Seafreeze plaintiffs also challenge the BOEM's termination of the EIS process in response to Vineyard Wind's request to provisionally withdraw the proposed COP from review, and the agency's subsequent decision to permit Vineyard Wind to rescind its withdrawal without providing an additional notice and comment period. Vineyard Wind asserts that the Seafreeze plaintiffs lack Article III standing to make this claim.

We agree, for reasons that track those explaining our ruling that the plaintiffs lack standing to complain about the allegedly improper issuance of the ROD and approval of the COP while reinitiation of ESA consultation was underway. See supra

Part III-A. Here too, even if we assume (again, with skepticism) that a second notice-and-comment period was required, the summary judgment record does not permit a conclusion that any taint from the alleged procedural error had a causal effect on the BOEM's ultimate approval of the COP. See Lujan, 504 U.S. at 561. The Seafreeze plaintiffs point to no comment that they, or anyone else, were precluded from submitting to the BOEM, and they suggest no other practical effect that flowed from the absence of a second notice-and-comment period. Any possibility of such an effect is, moreover, implausible, given that the COP was unchanged and already had been subject to extensive notice and comment. Thus, the alleged procedural error was not a likely cause of the Seafreeze plaintiffs' injury. See Ctr. for Bio. Div., 861 F.3d at 184. Nor, therefore, could it justify enjoining or unwinding the project.[8]

Finally, the Seafreeze plaintiffs argue that the BOEM failed to appropriately consider the incremental impact of the

---

[8] In addition to complaining about the lack of an additional notice-and-comment period, the Seafreeze plaintiffs say that resuming review of the Vineyard Wind COP was ultra vires because nothing in the NEPA or the OCSLA "provides the BOEM with authority to resume review of a terminated COP." But again, even if we assume that to be so, the Seafreeze plaintiffs have provided no basis in evidence or argument for concluding that this alleged procedural error likely tainted the injury-causing event: ultimate approval of the COP. There is no likelihood of a different outcome had the BOEM been required to formalistically reconduct its review process from the start rather than picking up where it left off. Moreover, without a basis for finding a likely causal effect, there would be no proper basis for enjoining or unwinding the project.

project in combination with the likely impact of other future, reasonably foreseeable offshore wind development projects. They support this argument only with two conclusory allegations: (1) "the Federal Defendants gutted the core of the cumulative impacts analysis set forth in the Supplemental Draft EIS by removing much of it from the [FEIS], thereby violating NEPA's regulations"; and (2) "the Federal Defendants improperly segmented their NEPA analysis" by "undercounting reasonably foreseeable offshore wind development outside the lease area." The Seafreeze plaintiffs do not elaborate upon either of these allegations.[9] They therefore have not put the correctness of the district court's ruling into issue. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citations omitted); see also id. ("It is not

---

[9] In their reply brief, in response to the defendants' arguments that the Seafreeze plaintiffs' briefing of the cumulative-impacts issue was inadequate, the Seafreeze plaintiffs point to a portion of the executive summary of the supplement to the EIS that, they say, did not make its way into the FEIS. They also seek to clarify that their position with respect to the BOEM's alleged improper segmenting of its cumulative effects analysis is that the BOEM improperly failed to treat certain aspirational goals that the Biden administration set for offshore wind development as "reasonably foreseeable future actions," within the meaning of 43 C.F.R. § 46.30, to be accounted for in the cumulative-impacts analysis. Arguments raised for the first time in a reply brief are ordinarily deemed waived, see Lahens v. AT&T Mobility P.R., Inc., 28 F.4th 325, 328 n.1 (1st Cir. 2022), and we see no reason to depart from that principle here.

enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . .").

The district court did not err in awarding summary judgment to the defendants on the plaintiffs' APA/NEPA and APA/MMPA claims.

C. **The APA/CWA Claims**

We next consider the challenge to the district court's grant of summary judgment to the defendants on the Alliance's APA/CWA claims. Although the Alliance makes three arguments on appeal, only one was properly preserved: that the Corps' decision to issue a CWA Section 404 permit for the discharge of dredged or fill material arbitrarily and capriciously failed to properly account for the effect of the project on commercial fisheries, wildlife, and the marine environment.[10] The court did not explicitly address this argument in its summary judgment order.

---

[10] The Alliance also claims that certain misstatements regarding the scope of the project contained in the Corps' section of the ROD, later corrected as clerical errors in an August 4, 2021, ROD Supplement, reveal that the Corps did not understand the scope of the project it was permitting. This claim is not preserved. The district court held it waived because it was not pleaded in the Alliance's complaint, and the Alliance does not engage this ruling in its opening brief. See Lahens, 28 F.4th at 328 n.1. The Alliance also claims that, in issuing the permit, the Corps violated the CWA by failing to consider the cumulative impacts of Vineyard Wind and other surrounding offshore wind projects. But the Alliance did not raise this concern with the Corps during its public comment process. It therefore cannot now seek to establish that the Corps acted arbitrarily or capriciously on this basis. See Dep't of Transp. v. Pub. Citizen, 541 U.S.

The Alliance argues that the Corps issued the permit under the mistaken belief that the impacts of the project on commercial fisheries, wildlife, and the marine environment would be minor. In support of this argument, the Alliance points to several statements in the FEIS which, if read in isolation, appear to project more-than-minor impacts from the project on commercial fisheries, commercial shipping, recreational vessel businesses, mollusks, fish, and crustaceans. But the Alliance's brief omits context that qualifies the statements in a manner that supports the Corps' conclusion.

For example, the Alliance cites to a page in the FEIS allegedly stating that the project will have "moderate to major impacts on commercial fisheries." App. at 141, Alliance Appeal. But in fact, that statement refers to the impacts of activities "other than offshore wind." Id. at 141. Similarly, the Alliance cites to alleged admissions that "offshore wind structures and hard coverage for cables would have long-term impacts on commercial fishing operations and support businesses such as seafood

752, 764-65 (2004); see also Vt. Yankee Nuclear Power Corp., 435 U.S. at 553-55 (emphasizing that a party must have presented a position during the administrative process to later challenge an agency decision as arbitrary and capricious for failure to have taken the position adequately into account). In so ruling, we reject the Alliance's assertion, made in its reply brief without supporting record citation, that it preserved its litigation rights on this point through comments it submitted to the BOEM during the EIS's public comment period.

processing," and that "the impacts would increase in intensity as more offshore structures are completed." Id. at 139. But the very same sentence concludes that "the fishing industry is anticipated to be able to adjust fishing practices over time in order to maintain the commercial fishing industry in the context of offshore wind structures." Id. And while the FEIS acknowledged that increased vehicle traffic from the construction of future offshore wind projects could result in congestion and delays that could decrease productivity for commercial shipping, fishing, and recreational vessel businesses, it also concluded that the project would have negligible to moderate impacts on navigation and vehicle traffic after required mitigation measures were implemented.

The Alliance also cites to pages in the Corps' section of the ROD noting anticipated adverse project impacts on the aquatic ecosystems. But those same pages note that some of these effects will be temporary, that required mitigation measures will reduce impacts, and that there may also be some environmental benefits from the project. Overall, after extensive analysis, the FEIS concluded that the project would have a moderate impact on fish and other aquatic organisms.

The record does not support a conclusion that the Corps acted arbitrarily or capriciously in issuing the CWA Section 404 permit because the Corps misunderstood the findings in the

administrative record.  The district court did not err in awarding summary judgment to the defendants on the Alliance's APA/CWA claim.

### D.  **The APA/OCSLA Claims**

Finally, we consider the challenges to the district court's grant of summary judgment to the defendants on the plaintiffs' APA/OCSLA claims.  The plaintiffs' principal appellate argument is that the district court misunderstood OCSLA's core statutory provision governing the approval of offshore wind projects, 43 U.S.C. § 1337(p)(4), in holding that the BOEM had not acted arbitrarily or capriciously in approving the COP.  Again, that provision imposes an obligation on the BOEM to "ensure that any activity [under the OCSLA] is carried out in a manner that provides for" twelve criteria including, insofar as is relevant, safety; protection of the environment; conservation of natural resources of the Outer Continental Shelf; prevention of interference with reasonable uses of the Outer Continental Shelf (as determined by the Interior Secretary); and consideration of any other use of the sea or seabed, including use for fishing and navigation.  Id.  The plaintiffs also argue that the court impermissibly discounted their evidence of safety concerns, environmental harms, and the devastating effect on commercial fishing that the project would cause.

The plaintiffs' principal argument is based upon mischaracterizations of the district court's reading of OCSLA

§ 1337(p)(4). The Alliance says that the court interpreted "the twelve mandatory requirements" as "discretionary considerations that [the BOEM] could consider and balance." The Seafreeze plaintiffs say that the court "decided to insert the word 'reasonably' into the statutory text to allow [the BOEM] to ostensibly 'balance' [its] mandatory duties under Section 1337(p)(4) against other considerations." The Alliance also says that the court read the statutory phrase "shall ensure" to "'reflect[] Congress's intent to confer flexibility . . . .'" And it further states that "the district court erroneously held" that Congress gave the BOEM "the discretion to ignore [the twelve OCSLA criteria] or to balance one off another. . . ."

The district court did not (1) treat the twelve OCSLA criteria as discretionary considerations that the BOEM "could consider," (2) read the word "reasonably" into the OCSLA, (3) say anything close to what the Alliance purports to quote it as saying, or (4) hold that the BOEM has the discretion to ignore or balance criteria. In fact, the court explicitly acknowledged that the OCSLA criteria are "mandatory," Seafreeze Shoreside, Inc., et al. 2023 WL 6691015, at *44, and proceeded from the premise that the BOEM must ensure that "each criterion is met" in a manner that is "not to the detriment of the other criteria." Id.

The district court held only that the BOEM must have "discretion" in considering whether each statutory criterion is

- 48 -

satisfied, and that the BOEM must "balance" the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide. The plaintiffs do not contest either of these points; in fact, they appear to concede them. See Reply Br. for Alliance at 3 ("[Defendants] incorrectly argue that the Alliance takes an absolutist position, arguing that [the BOEM] lacks any discretion at all in how to satisfy OCSLA's requirements. But this is not true."). In any event, the plaintiffs have not provided us with any basis for concluding that the district court's award of summary judgment to the defendants was infected by a misreading of OCSLA § 1337(p)(4).

Nor have the plaintiffs provided any other reason to find that the BOEM acted arbitrarily or capriciously under the OCSLA in approving the project. In focusing exclusively on the district court's alleged errors, the plaintiffs ignore the joint ROD and a May 10, 2021, information memorandum in which James F. Bennett, the Program Manager for the BOEM's Office of Renewable Energy Programs, explains the conditions that the BOEM imposed on the project and why approval of the project, with those conditions, satisfies the OCSLA § 1337(p)(4) criteria. Instead, the plaintiffs simply point to portions of the record which, when read

in isolation, appear to raise safety and environmental concerns.[11] The plaintiffs' position appears to be that, if a project is likely to have any modicum of impact on one or more of the twelve OCSLA criteria, the BOEM cannot approve it. See, e.g., Corrected Opening Br. for Seafreeze Pls. at 44 (challenging the district court's conclusion that the BOEM "still retains some discretion in considering whether the enumerated statutory criteria have been satisfied, even when the statute does not state so explicitly") (citations omitted). But see Reply Br. for Alliance at 3 ("[Defendants] incorrectly argue that the Alliance takes an absolutist position, arguing that [the BOEM] lacks any discretion at all in how to satisfy the OCSLA's requirements. But this is not true.").

---

[11] The plaintiffs also argue that the project likely will cause commercial fisheries to abandon the project area due to difficulties with navigation, in violation of OCSLA § 1337(p)(4). The plaintiffs support the argument by pointing to a statement to this effect that the Corps initially included in its section of the ROD but later removed with a clarifying statement, issued in the form of an ROD supplement, that inclusion of the statement "was based solely upon comments of interested parties submitted to BOEM during the public comment period" and "was not based upon any separate or independent [Corps'] or other agency evaluation or study, and accordingly does not represent the position of the [Corps] . . . ." The plaintiffs contest the veracity of the Corps' representation in the ROD supplement, but the ROD, taken as a whole, bears out the Corps' statement. See Supp. App. at 2016, Seafreeze Appeal (noting that the proposed discharge of fill "will likely have minor, long-term effects on recreational and commercial fisheries"); id. at 2023 (noting that the project "will have neutral impacts to navigation during construction and operation with the incorporation of mitigation").

This absolutist argument fails. A statute encouraging the development of offshore wind projects but obligating the BOEM to ensure that such projects be carried out in a manner that provides for safety, for example, cannot be read to prohibit project approval simply because one could imagine the project being involved in an accident. If that is the plaintiffs' position, we reject it. Moreover, as was the case with their APA/CWA arguments, see supra Part III-D, the plaintiffs' record citations in support of the claim that the BOEM did not ensure that the COP would be carried out in a manner that provides for the statutory criteria omit necessary context. They fail to acknowledge either the mitigation requirements that the BOEM imposed in response to the safety and environmental concerns raised, or that the concerns were raised in connection with alternatives that the BOEM had rejected.

The district court did not err in awarding summary judgment to the defendants on the plaintiffs' APA/OCSLA claims.

**IV.**

Before and after oral argument, we have received Fed. R. App. P. 28(j) letters alerting us to recent developments that have caused federal regulators to pause the project. These incidents, occurring after the challenged agency decisions, are not relevant to the arguments made in these appeals. See Town of Winthrop, 535 F.3d at 14 ("[T]he focal point for judicial review should be the

administrative record already in existence, not some new record made initially in the reviewing court.") (quoting <u>Camp</u> v. <u>Pitts</u>, 411 U.S. 138, 142 (1973)).

For the reasons explained, we **<u>affirm</u>** the judgments of the district court.